**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| JANETTE HARDY, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-51 |
| | ) | |
| DONALD J. TRUMP, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    I.     Plaintiffs Are Highly Likely to Succeed on the Merits of Their Complaint
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
         A.     Defendants' Coercive Approach to Requiring Employees to Work Without
              Pay Infringes Upon the Fifth and Thirteenth Amendments . . . . . . . . . . . 8
              1.     *Thirteenth Amendment Violation* . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              2.     *Fifth Amendment Violation*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
         B.     Defendants' Arbitrary Identification of "Excepted" Employees Under the
              Anti-Deficiency Act Violates Articles I and II of the U.S. Constitution
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         C.     Defendants' Conduct Violates Fundamental Tenants of the Fair Labor
              Standards Act
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         D.     Requiring Employees to Work Without Pay Categorically Violates the
              Anti-Deficiency Act
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
              1.     *31 U.S.C. § 1341* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
              2.     *31 U.S.C. § 1342* (volunteer services and emergency exception)
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    II.    Plaintiffs Will Suffer Irreparable Harm Without Adequate Legal Remedy
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    III.   No Substantial Harm to Other Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    IV.   No Significant Harm to Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, Plaintiffs, by and through undersigned counsel, respectfully move this Court for an order enjoining Defendants from:

1.      requiring employees to report for duty without pay during the current lapse in government appropriations;

2.      taking any adverse action against employees who decline to report for duty without pay during the current lapse in government appropriations; and

3.      restricting employees' ability to obtain outside employment (or other form of compensation) during the current lapse in government appropriations.

Plaintiffs are among hundreds of thousands of federal employees designated as "excepted employees" who are required to report to work without pay during the current lapse in government appropriations.  *See* Exhibits 2-5 (Declarations of Janette Hardy, Brandi Thornton, Dr. Kristen Rohde, and Justin Thornton); OPM, Guidance for Shutdown Furloughs, at 1 (describing "excepted" employee status).  As of tomorrow, the shutdown will be the longest one to date.  Put simply, excepted employees are required to report for duty and perform their assignments throughout the current lapse in government appropriations, but will not receive any compensation for this work until Congress passes and the President signs a new appropriation. Moreover, Plaintiff Hardy, as alleged in Count I in this Complaint, has been ordered to perform duties that cannot qualify as volunteer emergency services under the Anti-Deficiency Act. Excepted employees are compelled to work without pay under threat of discipline, up to and including removal from federal service.  OPM, Guidance for Shutdown Furloughs, at 8 ("[i]f an excepted employee refuses to report to work . . . [they] will be considered absent without leave

(AWOL) and will be subject to any consequences that may follow from being AWOL"); *see also*

*Brown v. Dep't of Justice*, 38 MSPR 332 (1988) (describing disciplinary consequences of

AWOL status, including removal).  While being deprived of earnings from their federal

employment, employees still remain subject to Defendants' rules on obtaining outside

employment without prior authorization.  OPM, Guidance for Shutdown Furloughs, at 4

(describing the continued application of government restrictions on outside employment for

affected employees); *see generally* 5 C.F.R. Part 2635 (describing numerous restrictions on

federal employees obtaining other forms of compensation).  These coercive tactics, conducted

under threat of stripping employees of their property interest in continued employment, squarely

violate Articles I and II and the Fifth and Thirteenth Amendments to the United States

Constitution, the Fair Labor Standards Act, and the Anti-Deficiency Act. Sonny Perdue

A temporary restraining order is necessary to avoid irreparable harm to the Plaintiffs.  In

the absence of such an order, Plaintiffs will be compelled to accept one of two absurd results:

perform involuntary labor without pay indefinitely, or be disciplined if they refuse to cooperate

with Defendants' squarely unlawful instructions.  Under either circumstance, Plaintiffs and other

employees of the executive branch are currently unable to look towards other income sources

due to Defendants' continued application of restrictions on outside employment and requirement

that excepted employees continue working their normal duties.  In essence, excepted federal

employees, under the status quo, must work for free and forego outside compensation.  In light

of the egregious statutory and constitutional violations effected by Defendants, the Court should

enjoin the government from requiring that employees to report for duty without pay; allow

employees to decline Defendants' unlawful instructions without consequence; and permit

employees to obtain outside employment during the current lapse in government appropriations without requiring government approval.

## FACTUAL BACKGROUND

As more fully described in Plaintiffs' Complaint, the dispute here centers around Defendants requiring Plaintiffs Janette Hardy, Brandi Thornton, Dr. Kristen Rohde, and Justin Thornton as "excepted" employees required to report to work without pay during the current lapse in government appropriations and the continued application of Defendants' rules on outside employment to Plaintiffs. Defendants took these actions in response to the current lapse in government appropriations, which began at 12:01 AM on December 22, 2018. In accordance with Defendants' established procedures for such circumstances, they divided all relevant employees into either "excepted" or "non-excepted" statuses and ordered the former to continue to work. Since then, Plaintiffs and other "excepted" employees have continually reported for duty without pay, and Defendants have instructed them to continue doing so on an indefinite basis. President Trump has stated that he expects the shutdown to last months, even years. *See* Sheryl Gay Stolberg and Michael Tackett, Trump Suggests Government Shutdown Could Last for 'Months or Even Years', NY TIMES (Jan. 4, 2019). Plaintiffs are among the many who rightly question the validity of Defendants' authority to require employees to work without pay under the U.S. Constitution, Fair Labor Standards Act, and Anti-Deficiency Act. Plaintiffs each desire to cease working without pay without jeopardizing their property interest in continued federal employment. *See* Exhibits 2-5. Defendants' rules governing "excepted" employees; the well established and common sense notion that AWOL employees can be removed; and the fundamental harms that result from egregious infringement upon fundamental constitutional

rights demonstrate that Plaintiffs will suffer irreparable injury absent injunctive relief permitting

them to decline Defendants' unlawful instructions.  Moreover, there is no legitimate public

interest in the government's receipt of coerced, unpaid labor.

## LEGAL STANDARD

"The standard for obtaining injunctive relief through either a temporary restraining order

or a preliminary injunction is well established."  *Gomez v. Kelly*, 237 F.Supp. 3d 13, 14 (D.D.C.

2017).  Plaintiffs are entitled to such relief if they establish (1) that they are substantially likely

to succeed on the merits of this suit; (2) that in the absence of an injunction, they would suffer

irreparable harm for which there is no adequate legal remedy; (3) that the injunction would not

substantially harm other parties; and (4) that the injunction would not significantly harm the

public interest."  *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995).  "In

applying this four-factored standard, district courts employ a sliding scale under which a

particularly strong showing in one area can compensate for weakness in another."  *Citizens for*

*Responsibility and Ethics in Washington v. Cheney*, 577 F.Supp. 2d 328, 334-35 (D.D.C. 2008).

For example, "a court may issue injunctive relief upon 'a particularly strong likelihood of

success on the merits even if there is a relatively slight showing of irreparable injury.'" *Alf v.*

*Donley*, 666 F.Supp. 2d 60, 69 (D.D.C. 2009) (quoting *CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

## ARGUMENT

Plaintiffs satisfy all four factors needed to justify a temporary restraining order or

preliminary injunction.  First, Defendants' requirement that Plaintiffs work without pay under

threat of stripping Plaintiffs of their property interest in continued federal employment squarely

violates the Fifth and Thirteenth Amendments; Articles I and II of the U.S. Constitution; the Fair

Labor Standards Act; and the Anti-Deficiency Act.  Second, Plaintiffs will suffer irreparable

harm through Defendants' displacement of their ability to obtain outside employment; and the

fundamental harms associated with being compelled to perform involuntary service in violation

of Plaintiffs' constitutional rights.  Third, Defendants would not suffer any substantial harm

because Defendants' have no legitimate interest in the receipt of unpaid, coerced labor and, even

if Plaintiffs' requested injunctive relief is granted, Defendants could still accept truly voluntary

services to address actual emergencies.  And fourth, as there is no legitimate public interest in

continued receipt of coerced, unpaid labor, the balance of the public interest weighs

overwhelmingly in favor of the exoneration of Plaintiffs' fundamental rights.  Accordingly,

Plaintiffs request that this Court enter an order enjoining Defendants from (1) requiring

employees to report for duty without pay during the current lapse in government appropriations;

(2) taking any adverse action other than a furlough against employees who decline to report for

duty without pay during the current lapse in government appropriations; and (3) restricting

employees' ability to obtain outside employment (or other form of compensation) during the

current lapse in government appropriations.

### I.      Plaintiffs Are Highly Likely to Succeed on the Merits of Their Complaint

Plaintiffs will ultimately be entitled to the declaratory and permanent injunctive relief

that they seek as this Court's authority to award such relief is well establish.  *See* 28 U.S.C. §

2201 (authorizing declaratory judgments "whether or not further relief could be sought"); *NTEU*

*v. Reagan*, 509 F. Supp. 1337 (D.D.C. 1981) (plaintiffs able to address federal employment

dispute through Declaratory Judgment Act); 28 U.S.C. § 2202 (authorizing "[f]urther and

necessary or proper relief based on a declaratory judgment or decree"); *Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F.Supp. 2d 53, 81 (D.D.C. 2008) (recognizing ability to proceed under Declaratory Judgment Act to address violations of a constitutional rights); *Ceant v. Aventura Limousine & Transp. Serv., Inc.*, 874 F.Supp. 2d 1373, 1381-82 (S.D. Fla. 2012) (recognizing ability to proceed under Declaratory Judgment Act to address FLSA violations); *Lopez v. Colonial Grp. of Am. Corp.*, 2013 U.S. Dist. LEXIS 199634 (S.D. Fla. 2013) (same); *Beshir v. Holder*, 10 F.Supp. 3d 165, 171 (D.D.C. 2014); *see also Kizas v. Webster*, 707 F.2d 524 (D.C. Cir. 1983).

## A.   Defendants' Coercive Approach to Requiring Employees to Work Without Pay Infringes Upon the Fifth and Thirteenth Amendments

Defendants have infringed upon their employees' Fifth and Thirteenth Amendment rights through the combination of (1) requiring employees to work without pay; (2) establishing procedures to jeopardize employees' property interest in continued federal employment if they fail to work without pay; and (3) displacing employees' ability to obtain any meaningful income unless they abandon that same property interest.  Together, these actions violate the Thirteenth Amendment's prohibition of involuntary servitude and the Fifth Amendment's protection from "arbitrary government interference" in employment relations.  U.S. Const. amend. V; U.S. Const. amend. XIII; *Traux v. Raich*, 239 U.S. 33, 41 (1915); *Chernin v. Lyng*, 874 F.2d 501, 505 (8th Cir. 1989); *see also Greene v. McElroy*, 360 U.S. 474, 492 (1959) (reiterating that the right to hold employment without unreasonable governmental interference falls within the Fifth Amendment's liberty and property guarantees).

### 1.   *Thirteenth Amendment Violation*

"The words involuntary servitude have a 'larger meaning than slavery.'" *Bailey v. Alabama*, 219 U.S. 219, 241 (1911) (quoting *Slaughter-House Cases*, 83 U.S. 36 (1872). "There is no more important concern than to safeguard the freedom of labor upon which alone can enduring prosperity be based." *Id.* at 245. The goal of the Thirteenth Amendment is to prohibit "mak[ing] labor free, . . . by which the personal service of one man is disposed of or coerced for another's benefit, *which is the essence of involuntary servitude*." *Id.* at 241 (emphasis added). By requiring Plaintiffs to work for free, with no guarantee of when or how they will be paid, while threatening their property interests, Defendants violate the Thirteenth Amendment.

The Thirteenth Amendment bars all involuntary servitude with only limited exceptions. Thus far, courts have recognized only criminal penalty, limited civic duties, and those subject to involuntary confinement as legitimate targets for coerced labor. *United States v. Kozminski*, 487 U.S. 931, 943 (1988); *Hurtado v. United States*, 410 U.S. 578, 589 (1973); *Selective Draft Law Cases*, 245 U.S. 366, 390 (1918); *Jobson v. Henne*, 355 F.2d 129, 131-32 (2d Cir. 1966); *Channer v. Hall*, 112 F.3d 214, 218-19 (5th Cir. 1997). Defendants' actions here evidence comparable legal coercion, but fall into none of the recognized exceptions.

Defendants' threat to place employees in an AWOL status and suffer the attendant consequences if they refuse to provide free labor is a direct threat against those employees' constitutional property interests. The Constitution prohibits Defendants from using their authority as government entities to utilize legal coercion to obtain free labor. Such legal coercion falls squarely within the constitutional prohibition against involuntary servitude; no recognized exception applies; and Plaintiffs are exceedingly likely to succeed on the merits of this claim as a result.

2.      *Fifth Amendment Violation*

The coercive conduct described above, combined with Defendants' continued imposition of restrictions on employees' ability to obtain outside employment, further violates the Fifth Amendment's protections for individual liberty and property.  "[E]mployees . . . have an interest in their employment relations which the Fifth Amendment protects from arbitrary government interference, regardless of whether the same employees . . . may dissolve their relationship at will."  *Chernin*, 874 F.2d at 506.  "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14th] Amendment to secure."  *Truax*, 239 U.S. at 41; U.S. Const. amend. XIV (applying Fifth Amendment's due process protections to states).  Plaintiffs here maintain constitutionally protected interests in continued federal employment under the Fifth Amendment.  *Kizas*, 707 F.2d at 539 (discussing the existence of property interests in continued federal employment); *Humberson v. United States Atty's Office*, 236 F.Supp. 2d 28, 31 (D.D.C 2003) ("Competitive Service employees possess a legitimate expectancy of, and therefore a protected interest in, continued federal employment").

The scheme established by Defendants amounts to "arbitrary government interference" in its employees' employment prospects in violation of their constitutionally protected liberty and property interests.  Defendants subject all relevant employees of the executive branch to restrictions on obtaining outside employment.  *See generally* 5 C.F.R. Part 2635.  During the government's normal operations, these restrictions reasonably serve to prevent corruption and conflicts of interest and to preserve the government's interest in the labor it is validly purchasing.  However, due to the lapse in government appropriation, the government can no

longer claim entitlement to the labor of these employees.  Defendants further displace Plaintiffs'

ability to obtain meaningful outside employment by requiring them to report to work for the

government for much of their time.  *See* Exhibits 2-5.  Rather than releasing its employees from

these restrictions, Defendants require them to report to their normal duties and only seek outside

employment within the confines of 5 C.F.R. Part 2635, effectively stripping them of all

meaningful income potential.  This arbitrarily and unreasonably interferes in these employees'

entitlement to "work for a living in the common occupations of the community[.]" *Truax*, 239

U.S. at 41.

That employees can resign their positions to obtain outside employment, and therefore

"work for a living" as constitutionally guaranteed, does not alleviate the unconstitutional

character of Defendants' actions.  As detailed above, Defendants' employees maintain a property

interest in continued federal employment.  Requiring those employees to surrender their property

interest to assert their constitutional rights to employment without arbitrary interference would

simply result in further violation of the Fifth Amendment's property protections.  Moreover, that

employees "may dissolve their relationship at will" is irrelevant to this constitutional question.

*Chernin*, 874 F.2d at 506.  The sole constitutionally viable solution is that, while the government

lacks any valid claim to its employees services because it is not paying for that labor, it has no

basis to continue imposing outside employment restrictions on those same employees.  If new

appropriations are enacted, Defendants are free to impose those restrictions once again.  But

while the government remains closed, the imposition of labor restrictions—over employees

whose labor and loyalty that Defendants cannot legitimately claim—remains arbitrary and

unconstitutional.  Plaintiffs are therefore likely to succeed on the merits of this claim.

B.      Defendants' Arbitrary Identification of "Excepted" Employees Under the
        Anti-Deficiency Act Violates Articles I and II of the U.S. Constitution

The U.S. Constitution reserves to Congress exclusively the power to appropriate funds.

U.S. Const., art. 1, § 8.  Such authority is self-evidently, and purposefully, withheld from the

Executive.  U.S. Const., art. 2.  Despite these centuries-old delineations, Defendants currently

utilize an extremely limited provision in the Anti-Deficiency Act to compel hundreds of

thousands of "excepted" federal employees to perform work.  In doing so, the Executive is

effectively appropriating future funds for specific purposes (paying employees) without any

current Congressional appropriation.  More specifically, by ordering employees to report to work

and having them do so, Defendants, as part of the executive branch, are creating obligations to

pay those employees a minimum wage and overtime under the Fair Labor Standards Act.  *See

generally Martin v. United States*, 130 Fed. Cl. 578 (2017)*; discussion *infra*, § I.C.  As a result,

the Executive is obligating the payment of funds to these employees without an appropriation

therefor.

Denominating excepted employees as "excepted" under the Anti-Deficiency Act, when

they are forced to work under threat of removal and when Congress has elsewhere mandated that

such employees be compensated, is merely an artifice that does not negate the Executive's

unlawful obligation of federal funds.  Moreover, Congress's broad power of the purse is non-

delegable: to the extent that the Anti-Deficiency Act purports to authorize the Executive to

accept "volunteer" services of federal employees to avert "emergencies," when the acceptance of

those services necessarily carries an obligation to pay for such services, such an authorization

would constitute an impermissible delegation of Congress's exclusive power of appropriation to

the Executive.  Moreover, allowing the Executive to unilaterally decide, through the designation

of "excepted" employees, which programs it wishes to pursue and which to idle would

impermissibly grant the executive authority to decide what programs to run and incur obligations

for regardless of otherwise present Congressional mandates.  *See Youngstown Sheet & Tube Co.*

*V. Sawyer*, 343 U.S. 579, 588 (1952) ("The Constitution does not subject this [Article I]

lawmaking power of Congress to presidential or military supervision or control.")

      C.    <u>Defendants' Conduct Violates Fundamental Tenants of the Fair Labor
Standards Act</u>

In requiring its employees to report for duty without pay, Defendants have engaged in

and will continue to effect basic violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et*

*seq*.  The imposition of a minimum wage is among the FLSA's core principles, and this

fundamental requirement bears no exception for when an employer lacks the funds to pay wages

owed under the Act.  29 U.S.C. § 206(a)-(b).  Because Defendants have demonstrated a clear and

unequivocal intent to continue to violate the FLSA, Plaintiffs are highly likely to succeed in

obtaining their requested relief.

Plaintiffs here do not seek to recover damages for this violation, but rather declaratory

and injunctive relief proscribing the behavior to prevent further clear violations of employees'

rights and ensure their ability to meaningfully oppose these unlawful practices.  The FLSA

guarantees that covered employees must receive on-time payment of any minimum wage and

overtime wages earned, even during a lapse in appropriated funds.  *See, e.g.*, *Biggs v. Wilson*, 1

F.3d 1537, 1540 (9th Cir. 1993).  On an ongoing basis, with no current reason to believe the

circumstances will change, Defendants require Plaintiffs to perform their duties while squarely

admitting they have no capacity to pay for this work.  *See* Jane Timm, Government Employees

Could Go Without Pay for Nearly a Month, At Least, NBC NEWS (Jan. 7, 2019) ("payroll will

not go out as originally planned on Friday night").  Despite many public promises by various officials that they intend to pay Plaintiffs and other employees eventually, Defendants have no actual authority to make such a guarantee—new funds can only be allocated by Congress (with either the signature of the President or Congress overriding his veto).  U.S. Const. art. I, § 7; 31 U.S.C. § 1341.  The status quo is, and will continue to be, that Defendants require their employees to continue working with no guarantee of actually receiving compensation for such work.  This unequivocally violates the Fair Labor Standards Act, and Plaintiffs are highly likely to succeed on the merits of this portion of their claims as a result.

> D.  Requiring Employees to Work Without Pay Categorically Violates the Anti-Deficiency Act

The Anti-Deficiency Act represents the legislative branch's statutory enforcement of its constitutional authority to control the purse.  *See* The Government's Liability for Actions of its Agents that Are Not Specifically Authorized: the Continuing Influence of *Merrill* and *Richmond*, 32 Pub. Cont L.J. 774, 808-09 (2003) (discussing intent behind the Anti-Deficiency Act).  By requiring employees to report to work without pay until a new appropriations bill is passed, Defendants continue to violate two primary provisions of the Act.  First, having employees report for duty without pay generates an obligation to pay those employees once a new appropriations bill is passed, and necessarily "authorizes an . . . obligation exceeding an amount available in an appropriation or fund" in violation of 31 U.S.C. § 1341.  Second, Defendants continue to violate 31 U.S.C. § 1342 because (1) the coerced services it is receiving from its employees cannot constitute "voluntary" or "employ[ed]" services within the meaning of the statute and (2) even if they do, Defendants' application of the emergency services exception that would allow Defendants to accept such services is unlawful.

14

1.      *31 U.S.C. § 1341*

The Anti-Deficiency Act's primary provision, 31 U.S.C. § 1341, unequivocally and without exception bars any of Defendants' officers or employees from "mak[ing] or authoriz[ing] an expenditure **or obligation** exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]"  By requiring employees to report to work without pay, and therefore incurring an obligation to eventually provide those workers back pay under the Fair Labor Standards Act, Defendants have blown the doors off of the Act's efforts to limit this exact conduct.  In doing so, Defendants are creating countless obligations to pay its employees at an unspecified date with no current appropriation or fund from which they can draw to meet that obligation.

With no valid underlying appropriation or fund, Defendants are repeatedly creating obligations within the meaning of § 1341 by creating a duty to pay their employees under the Fair Labor Standards Act.  The FLSA's general rule is that employers, including Defendants, "shall pay to each of [their] employees" a minimum wage at every regularly scheduled pay period. 29 U.S.C. § 206(a) (establishing obligation to pay minimum wage); *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 707 (1945) (establishing that employees must be paid at their regular pay periods under the FLSA); Nick Visser, Thousands of Federal Workers Just Missed Their First Paycheck, HUFFINGTON POST (Jan. 11, 2019).  Even where the government receives unpaid labor during a government shutdown, an obligation for Defendants to eventually compensate them under the FLSA accrues.  *See generally Martin v. United States*, 130 Fed. Cl. 578 (2017). Regardless of whether the government is breaching its obligations under the FLSA—which is a separate inquiry entirely—it is creating obligations to expend funds on its employees by virtue of

having them perform work during the lapse in government appropriations.  The creation of these obligations violates any reasonable interpretation of § 1341(a)(1)(A).  Plaintiffs' likelihood of success on the merits of this claim is therefore sufficient to require the Court to enjoin Defendants' conduct.

2.       *31 U.S.C. § 1342* (volunteer services and emergency exception)

No interpretation of 31 U.S.C. § 1342 would permit Defendants' use of the emergency volunteer services exception to compel employees to work without pay indefinitely.  § 1342, in relevant part, provides that:

> An officer or employee of the United States Government or of the District of Columbia Government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property. . . . As used in this section, the term "emergencies involving the safety of human life or the protection of property" does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.

The services at issue here are not "voluntary" or "employ[ed]" by definition and, even if such services do fall within the scope of § 1342, Defendants' sweeping approach to its use is unlawful.

Defendants cannot claim to legitimately receive services from "excepted" employees as volunteer services falling under § 1342 because these services are not voluntary to begin with. First, the Court of Federal Claims has already established that unpaid services provided by federal employees during a government furlough still require compensation.  *See Martin*, 130 Fed. Cl. at 584.  Because these services require eventual compensation, they cannot be deemed "voluntary" within the meaning of the Anti-Deficiency Act.  *See Voluntary*, BLACK'S LAW DICTIONARY (2d Ed.) ("Without valuable consideration; gratuitous . . . Having merely nominal

consideration").  Absent the government's obligation to eventually compensate employees for this work, the coercive nature of eliciting this unpaid labor from its employees, detailed above, also stands to defeat the assertion that the services at issue are "voluntary."  Nor can Defendants be said to have "employ[ed] personal services" within the meaning of § 1342—to employ requires actual compensation and voluntary agreement by both the employee and employer, neither of which exist here.  *See Tennessee Coal Iron & R. Co. v. Muscoda Local No. 123, Ala.*, 321 U.S. 590 (1944).

Even assuming that the services performed by Plaintiffs are "voluntary" or "employ[ed]" within the meaning of § 1342, they are still prohibited because Defendants' application of the emergency exception that would allow them to receive such services is unlawful.  This is true both generally for federal employees and as applied to the specific Plaintiff Janette Hardy.  In fact, Defendants' use of this provision is directly contrary to the Congressional intent behind the Act:

> ongoing, regular operations of the Government cannot be sustained in the absence of appropriations, except in limited circumstances.  These changes [to clarify the emergency exception] guard against what the conferees believe might be an overly broad interpretation . . . regarding the authority for the continuance of Government functions during the temporary lapse of appropriations, and affirm that the constitutional power of the purse resides with Congress.

H.R. Conf. Rep. No. 964, 101st Cong., 2d Sess. 1170 (1990).

The plain reading of § 1342 does not encompass all federal employees—in 1996, Congress purposely, and only temporarily, amended § 1342's emergency services exception to include "all officers and employees" of the federal and D.C. governments.  Pub. L. 104-92, 110 Stat. 20, title III, § 310(a) (Jan. 6, 1996) (amendment expiring effective Jan. 26, 1996).  That temporary provision has since expired, leaving only the exception for emergency services and

specifically excluding "ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." 31 U.S.C. § 1342. The Court must conclude that Congress did not intend the language of the underlying statute to permit such a broad approach.

With respect to Plaintiff Janette Hardy, she has been ordered to report for duty, but then tasked with responsibilities that cannot plausibly fall within any reasonable interpretation of § 1342. Although she is an Air Traffic Control Specialist, she has not actually been tasked with administering the nation's air traffic control network. Exhibit 2 (Janette Hardy Declaration). This is the immediate result of Defendants' broad-brush use of the emergency services exception under § 1342 to label whole categories of employees as "excepted" rather than conducting the required inquiry into the specific duties of each employee. Section 1342 explicitly proscribes use of this exception for "ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." This necessarily requires a fact-specific inquiry into employees' duties to determine if an imminent threat would result from their suspension, yet Defendants have opted for broad application of this exception in a manner that has dragged in Plaintiff Hardy and countless other federal employees who cannot be reasonably deemed to fall within the exception. *See, e.g.*, Damian Paletta, White House Rules IRS Can Issue Tax Refunds During Shutdown, Aims to Bring Back Agency Employees, WASHINGTON POST (Jan. 7, 2019) (announcing return of IRS employees to duty for the processing of tax returns).

Plaintiffs have each been instructed they must be report for duty, but are not being paid. Exhibits 2-5. It follows that they cannot be reasonably be deemed to be "volunteering" or

"employ[ed]" within the meaning of § 1342.  This patently erroneous result of Defendants' use

of the Anti-Deficiency Act cannot be sustained, and Plaintiffs are highly likely to succeed on the

merits of this claim.

## II.  Plaintiffs Will Suffer Irreparable Harm Without Adequate Legal Remedy

Without the requested order, Plaintiffs will suffer irreparable harm through obstruction of

their ability to obtain income; continued infringement of their Fifth and Thirteenth Amendment

rights; and related economic harms.  "To be irreparable, an injury must be 'certain and great,'

'actual and not theoretical,' and 'of such imminence that there is a clear and present need for

equitable relief to prevent irreparable harm.'" *Fraternal Order of Police Library of Cong. Labor*

*Comm. v. Library of Cong.*, 639 F.Supp. 2d 20, 24 (D.D.C. 2009) (quoting *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Where retroactive

compensatory or corrective relief would not adequately address the harms at issue, preliminary

relief is appropriate.  *See id.*  The injuries that Plaintiffs will suffer absent a temporary

restraining order and preliminary injunction are imminent as Defendants expect Plaintiffs to

continue to report for duty without pay and, as each day passes without Plaintiffs earning salary,

their economic situation becomes more dire.

Absent the ability to forego Defendants' orders to report for duty and seek outside

employment without restriction, Plaintiffs (and innumerable other federal employees) will suffer

irreparable economic harms.  Defendants expect "excepted" employees to report for duty without

pay on an indefinite basis and subject them to restrictions on obtaining outside employment.

Such interference strips Plaintiffs of all meaningful economic opportunities to make use of their

labor.  Defendants apparently recognize this but, in scrambling to assuage the self-evident harms

of these actions, have resorted to the absurd.  For example, on December 27, 2018, OPM issued guidance to federal employees that, instead of honoring their contractual obligations, they should barter services in lieu of payments to their landlords.  *See* Gina Martinez, Federal Government Advised Furloughed Employees to Offer Manual Labor for Rent During Shutdown, TIME (Dec. 29, 2018).[1]  It further advised employees to request temporary abatement of other financial obligations, including payments for their mortgages and other credits.  In effect, Defendants have instructed their employees to willfully and purposefully breach contracts, but to do so by asking nicely in the hopes their creditors forgive them.  *See also* Dan Lamothe, Coast Guard Families Told They Can Have Garage Sales to Cope with Government Shutdown, WASHINGTON POST (Jan. 9, 2019) (discussing guidance advising employees' to sell their own possessions in response to Defendants' actions).

The fundamental constitutional harms here are also sufficient to warrant a TRO or preliminary injunction.  Intangible harms have been recognized time and again as a type of injury under this analysis.  *See, e.g. Brodie v. U.S. Dep't of Health and Human Servs.*, 715 F.Supp. 2d 74, 84 (D.D.C. 2010) (recognizing harms to reputation as relevant under the preliminary injunction analysis and describing similar cases).  Plaintiffs stand to suffer such serious harms not only to their economic prospects, but also the fundamental and egregious harms that result from violations of fundamental constitutional rights with inadequate ability to fully recover for the harms caused by such behavior.  *See generally Carey v. Piphus*, 435 U.S. 247, 258-59, 262-63 (1978) (discussing limitations on the ability to recover damages for violations of constitutional rights and claims under 42 U.S.C. § 1983).  Being compelled to

---

[1] The original guidance issued by OPM via Twitter has since been modified to remove their sample letter to landlords offering bartered services.

perform unpaid labor, under threat of deprivation of a property interest, is itself a harm

regardless of the economic consequences.  *See generally* Jean C. Love, *Damages: A Remedy for

the Violation of Constitutional Rights*, 57 Cal. L. Rev. 1242 (1979).

These impending harms also cannot be adequately addressed through other means.

Plaintiffs' sole alternatives to this injunctive relief are (1) acquiescing to Defendants' unlawful

conduct or (2) refusing Defendants' unlawful instructions, be placed in an AWOL status, and

suffer any resulting adverse actions up to and including removal.  The former would merely

exacerbate the current harms and the latter would cause Plaintiffs to suffer severe, irreparable

injuries.  Nor would Plaintiffs be able to obtain review of their constitutional claims by appealing

any adverse action taken by Defendants based on that AWOL status to the Merit Systems

Protection Board (MSPB) because that body both has no authority to address the

constitutionality of Defendants' actions and has exclusive jurisdiction over the underlying case

that would result.  *Elgin v. Dep't of Treas.*, 567 U.S. 1, 8 (2012).  Even if Plaintiffs could obtain

meaningful review from the MSPB, they cannot currently obtain such review because that body

currently both lacks a quorum to issue decisions and has ceased operations during the

government shutdown.  *See* MSPB, Status of the U.S. Merit Systems Protection Board During a

Partial Government Shutdown (Dec. 21, 2018); MSPB, Frequently Asked Questions about the

Lack of Board Quorum (June 21, 2018).

Similarly, Plaintiffs are currently without recourse for other monetary harms because the

judiciary cannot constitutionally order Congress to appropriate money.  *City of Houston, Texas v.

Dep't of Housing & Urban Development*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("[w]hen the

relevant appropriation has lapsed . . . the federal courts are without authority to provide monetary

relief."); *Rochester Pure Waters Dist. V. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992).  Because

Plaintiffs are ultimately entitled to declaratory and injunctive relief on their claims, as detailed

above, they are equally entitled to a preliminary injunctive relief to avert these harms.

### III.    No Substantial Harm to Other Parties

There would be no substantial harm to Defendants because (1) they cannot claim to be

harmed through the Court discontinuing their receipt of unlawful, coerced, unpaid labor; and (2)

actual emergency functions of the government, properly construed under the Anti-Deficiency

Act and guided by the Court, can still operate if Plaintiffs' requested injunctive relief is granted.

For the former, Defendants are only currently receiving the benefit of unpaid services, and are

not "harmed" in a way that is relevant to this inquiry as a result of the Court entitling employees

to refuse Defendants' unlawful requests for free labor.  More specifically, Defendants cannot be

deemed to be harmed by virtue of no longer receiving what was never theirs to begin with.

Defendants have no valid claim to labor for which they are not paying, no more than a common

thief has a valid claim to the receipt of stolen goods.  *See Brown v. United States*, 411 U.S. 223,

230 n. 4 (1973).

### IV.    No Significant Harm to Public Interest

The public interest weighs heavily in favor of granting Plaintiffs' requested injunctive

relief.  The public maintains a significant interest in the exoneration of Plaintiffs' constitutional

rights and deterrent of Defendants' criminal violations of the Anti-Deficiency Act.  And as is

particularly relevant here, the public maintains no legitimate interest relevant to this inquiry in

the government's continued receipt of unpaid, coerced labor.

The public maintains strong interests in ensuring that Plaintiffs, and other federal

employees subjected to this unlawful conduct, have their constitutional rights guaranteed.  At issue here is Defendants' manipulation of the Anti-Deficiency Act to compel unpaid labor from employees under threat of deprivation of a property interest.  Were the government to have authority to take such action generally, its authority would be so expanded (and the Fifth and Thirteenth amendments so depleted) as to render the relevant constitutional provisions wholly meaningless.  The public's interest therefore falls squarely in preemptively limiting the government's authority to compel labor without payment.  The scope and duration of the government's actions here—compelling hundreds of thousands of individuals to work without pay for what has been promised to be months, if not years—is unprecedented.

A discontinuation of Defendants' unlawful (indeed, criminal) activities under the Anti-Deficiency Act also causes the public interest to weigh in favor of Plaintiffs' Motion.  The Act provides that "An officer or employee of the United States Government . . . knowingly and willfully violating section 1341(a) or 1342 of this title shall be fined not more than $5,000, imprisoned for not more than 2 years, or both."  31 U.S.C. § 1350.  As detailed above, Defendants are unquestionably committing countless violations of both § 1341 and § 1342.  The public's interest in avoiding criminal activity in the first instance supports the issuance of injunctive relief proscribing such activity.  Defendants' eliciting this unpaid labor by threatening Plaintiffs' property interests implicates 18 U.S.C. § 1589(a), which bars receipt of unpaid services "by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]" *See also* 18 U.S.C. 1589(c)(2) (defining "serious harm" as "any harm, whether physical or non-physical . . . that is sufficiently serious, under all the

surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.").  Moreover, the public's interest also supports allowing Plaintiffs to disassociate themselves from Defendants' conduct.

There is no public interest relevant to this inquiry in the government's continued receipt of unpaid labor under threat of termination.  Put simply, there is "no legitimate public interest" in unlawful behavior.  *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 472 (5th Cir. 2017).  The government cannot claim a legitimate public interest in continued receipt of unpaid services because receipt of such services is unquestionably unlawful.  *See id*.; *see* discussion *supra* Part I; *but see AFGE v. Rivlin*, 1995 U.S. Dist LEXIS 17630 (D.D.C. 1995).  The value in the government's receipt of these unpaid services is therefore irrelevant to the inquiry here.

The public's interest lies in having a paid federal workforce, not forced labor under threat of permanent deprivation of one's livelihood.  The federal workforce is comprised of hard-working and dedicated individuals who have dependants to support, housing, student loans, medical care to pay for, and groceries to buy.  Requiring these employees to work without pay while threatening their property interests in federal employment not only violates the law, but also treads upon the very principles this government was created to protect.  A paying job is the key to freedom for most people.  It is how the average American gets by on a daily basis.  Forcing employees to continue to work through the shutdown without pay prevents them from obtaining other work needed to meet their financial obligations.  Without a paycheck these federal workers cannot pay for the roof over their heads or the food that feeds their families.

Nikki Wentling, *'A* Daily Struggle': Veterans in Federal Workforce Feel Effects of Government Shutdown, STARS AND STRIPES (Jan. 9, 2019).  Without a paycheck they will incur otherwise unnecessary debts and balances that accrue interest at an alarming rate.  Forcing employees into unpaid labor under threat of permanent loss of their employment places them in the unenviable position of having to choose between keeping the lights on today and long-term employment.

Furthermore, the federal government should strive to be the model employer.  There is no place for these purposeful and blatant violations of the Constitution, the FLSA, and the Anti-Deficiency Act by the federal government against its employees.  Such violations of law would not be tolerated by a private employer, nor should it be excused when the federal government commits these acts.  The federal government is the country's largest employer and must be held (at least) to the same standards as any other employer.  Allowing the federal government to lapse in its obligations to its employees sets an undesirable precedent for other employers to follow.  There is no public interest in allowing violations of the law to go unchecked.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction should be granted and Defendants enjoined from (1) requiring employees to report for duty without pay during the current lapse in government appropriations; (2) taking any adverse action other than a furlough against employees who decline to report for duty without pay during the current lapse in government appropriations; and (3) restricting employees' ability to obtain outside employment (or other form of compensation) during the current lapse in government appropriations.

Respectfully submitted,

 /s/ Daniel Clark.                               
Michael Kator, D.C. Bar No. 366936
Cathy A. Harris, D.C. Bar No. 467206
Daniel Clark, D.C. Bar No. 156052
KATOR, PARKS, WEISER & HARRIS, PLLC
1200 18th Street, N.W.
Suite 1000
Washington, D.C.  20036
Phone: (202) 898-4800
Fax: (202) 289-1389
mkator@katorparks.com
charris@katorparks.com
dclark@katorparks.com

Attorneys for Plaintiffs

Date:   January 11, 2019